UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRUCE HOWARD,

                              CASE NO. 2:10-CV-11470

           Plaintiff,         JUDGE GEORGE CARAM STEEH

                              MAGISTRATE JUDGE PAUL J. KOMIVES

v.

BETH GARDON, SCOTT CHADWELL,
DEBRA SCUTT, ALFRED JONES,
VALERIE LASHLEY, RICHARD RUSSELL
and PATRICIA CARUSO,

                Defendants,

_____/

## REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR DISMISSAL AND/OR SUMMARY JUDGMENT (Doc. Ent. 9)

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.     Gardon, Chadwell, Scutt, Lashley and Caruso's Pending Dispositive Motion . . . . . . . . . . . . . . 5
     C.     Russell and Jones Have Not Timely Responded to Plaintiff's Complaint. . . . . . . . . . . . . . . . . . 6
     D.     Fed. R. Civ. P. 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
     E.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
           1.     Plaintiff's complaint alleges retaliation, deliberate indifference, due process, fraud and conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
           2.     Defendants Gardon, Chadwell, and Lashley are not entitled to summary judgment on the basis that plaintiff has failed to exhaust his administrative remedies in accordance with 42 U.S.C. § 1997e(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
           3.     At this time, Gardon, Chadwell and Lashley are not entitled to dismissal based upon plaintiff's failure to state claims of retaliation, deliberate indifference, fraud and/or conspiracy against them. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
           4.     Defendants Scutt and Caruso are entitled to dismissal based upon plaintiff's failure to state a claim upon which relief may be granted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
           5.     The Court need not address whether defendants Scutt and Caruso are entitled to qualified immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
           6.     Defendants Jones and Russell are entitled to *sua sponte* dismissal based upon plaintiff's failure to state a claim of fraud against them. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
           7.     Defendants' request for an award of costs is premature. . . . . . . . . . . . . . . . . . . . . . . . . 39

III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1

I.    **RECOMMENDATION:**  The Court should grant in part and deny in part defendants Gardon, Chadwell, Scutt, Lashley and Caruso's July 30, 2010 dispositive motion (Doc. Ent. 9).

Specifically, defendants Gardon, Chadwell and Lashley are not entitled to summary judgment or dismissal with respect to plaintiff's claims against them (Sections E.2 & E.3); defendants Caruso and Scutt are entitled to dismissal under Fed. R. Civ. P. 12(b)(6) based upon plaintiff's failure to state a claim against them (Sections E.4 & E.5); and defendants Jones and Russell are entitled to sua sponte dismissal under Fed. R. Civ. P. 12(b)(6) based upon plaintiff's failure to state a claim against them (Section E.6).

II.    **REPORT:**

A.    **Background**

On April 27, 1994, Bruce Howard received several life sentences for armed robbery (Mich. Comp. Laws § 750.529).  Wayne County Case No. 93-2433.[1]  He is currently incarcerated at the Kinross Correctional Facility (KCF) in Michigan's Upper Peninsula.[2]

According to Howard, he "has a medi[c]al history of Lupus[,]" including heart, kidney, eye, skin, joint and hair complications.  Doc. Ent. 1 at 1.  During January 2009, he was transferred to the G. Robert Cotton Correctional Facility (JCF) in Jackson, Michigan for physical therapy.  Doc. Ent. 13 at 23; Doc. Ent. 25 at 4.  He received physical therapy until April or May, 2009.  Doc. Ent. 25 at 4.

_____

[1]Howard has filed three (3) petitions for writ of habeas corpus: (1) Case No. 2:01-cv-72774-VAR (filed July 25, 2001); (2) 2:06-cv-11197-RHC-WC (E.D. Mich.) (filed Mar. 21, 2006); and (3) Case No. 2:08-cv-10222-PDB-DAS (E.D. Mich.) (filed Jan. 15, 2008).

[2]*See* www.michigan.gov/corrections, "Offender Search."  *See also* Doc. Ent. 12.  The MDOC has six (6) correctional facilities in the Upper Peninsula: (1) Ojibway (OCF); (2) Baraga (AMF); (3) Marquette (MBP); (4) Alger (LMF); (5) Newberry (NCF) and (6) Chippewa (URF) / Kinross (KCF).

Howard applied for a job at MSI.[3]  On May 18, 2009, Howard "was hired at MSI, a security screen was performed by the Inspector at JCF, no problems were found."  Doc. Ent. 25 at 4.

While at JCF, Howard had several flare-ups of his medical condition and a number of visits to Duane L. Waters Hospital (DWH) and Foote Hospital, both in Jackson, Michigan.  After Howard was denied treatment by his Rheumatologist, Howard's sister called JCF and spoke with Health Care Manager Beth Gardon.  Doc. Ent. 25 at 4.

On August 27, 2009, he wrote to Beth Gardon (described as the Health Care Manager at JCF).  Therein, Howard mentioned his rheumatologist's (Dr. Barbara McIntoch's) two recommendations for an air mattress, which were allegedly denied by the Regional Medical Officer (RMO).[4]  Howard claimed he was not seen by a doctor at JCF regarding an air mattress, so he proposed that his family purchase the air mattress for him.  Howard claims he did not receive a response to this kite.  Doc. Ent. 1 at 1; Doc. Ent. 13 at 17 (Letter).

On September 16, 2009, Howard again wrote to the JCF Health Care Manager.  First, he renewed his request for his family to buy him an air mattress, explained his symptoms, stated that he has been denied the opportunity to see his Rheumatologist and claims to have been informed by a female doctor that he is "on the alternative treatment plan."  Also, he added a

---

[3]"Michigan State Industries (MSI) a division of The Office of Employment Readiness (OER) will provide prisoners of the Michigan Department of Corrections academic, career, and technical education, and workplace skills training programs in order to acquire and maintain a job. The OER team will accomplish this mission within a continuous quality improvement environment to ensure the most cost effective programs." *See* http://www.michigan.gov/msi.

[4]Howard claims to have written a grievance about this matter, but it was determined that "the specialist can only recommend a treatment plan, and [it is] up to the site doctor to see if the treatment plan [is feasible]."  Doc. Ent. 13 at 17.

3

request for bottled water based upon his auto-immune disorder, citing a Water Quality Report

which mentioned "IMMUNE SYSTEM DISORDERS."  Howard explained that he has

consistently had diarrhea.  According to Howard, this problem was mentioned in his medical

kites but has not been resolved.  Doc. Ent. 1 at 1-2; Doc. Ent. 13 at 18-19 (Letter).

On September 22, 2009, Howard's medical condition flared-up.  He "was in a

tremendous amount of pain, and had to go to health care for a shot to relie[ve] the pain."  Doc.

Ent. 1 at 2.

On September 24, 2009, Howard was transferred from JCF to KCF.  Doc. Ent. 1 at 2;

Doc. Ent. 13 at 23.[5]  Howard contends that the extremely cold weather has affected him; there is

no rheumatologist; and he allegedly suffers extreme amounts of pain.  Doc. Ent. 1 at 2.

Howard attests that, on March 15, 2010, the KCF Doctor "saw the need for [Howard] to

be transferred to a facility that was closer to Rheumatology/Nephrology[.]" Doc. Ent. 15 ¶ 16.[6]

That day, Haresh B. Pandya, M.D. (apparently the RMO), deferred Dr. Pizza's request for off-

guideline medical details and special accommodations, because there was "[n]ot enough data to

---

[5]In his August 19, 2010 response, Howard claims that "[o]n arriving at [KCF] [he] had a flare-up of his medical condition[.]" Doc. Ent. 13 at 10.  In his November 22, 2010 response, Howard states, "from the very first day back at KCF [he] had to be seen by KCF's health care, for a [flare] up of his Lupus, and [he was denied] treatment by [a] Rheumatoidologist."  Doc. Ent. 25 at 14.

[6]The request was specifically for "[c]onsideration to allow transfer of [Howard] to a facility closer to Rheumatology/Nephrology Services for 12 month exacerbation of Systemic Lupus.  MSP at KCF has been unable to get [Howard] back to baseline comfort and status despite ag[g]ressive steroid use.  Now also would benefit from calorie controlled/protein controlled diet line facility."  Doc. Ent. 13 at 37.

Systemic Lupus Erythematosus (SLE) is a "serious, often fatal, disease accompanied by various lesions (injuries) in the viscera (organs), skin eruptions, fever, and other symptoms." SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 3, L-199 (1995).

show patient needs all the [services] requested frequently enough to justify transfer." Doc. Ent. 13 at 36-37.

Howard filed this prisoner civil rights case on April 13, 2010 while incarcerated at KCF. Doc. Ent. 1 at 1-6.[7] The events underlying the complaint begin with the aforementioned health care kites which occurred during his incarceration at JCF. Doc. Ent. 1 at 1-2. The facts continue past his September 24, 2009 transfer to KCF, including details about a grievance he filed against JCF employees Gardon and Chadwell. Doc. Ent. 1 at 2-5.[8] Plaintiff seeks injunctive relief (in the form of an order permitting plaintiff to be placed back in Dr. Barbara McIntoch's care), compensatory damages and punitive damages. Doc. Ent. 1 at 5-6.[9]

Defendants are JCF employees Beth Gardon (Health Unit Manager), Scott P. Chadwell (ARUS), Debra Scutt (Warden), Alfred Jones (Administrative Assistant), Valerie Lashley (LNU, Transfer Coordinator),[10] and MDOC employees Richard Russell (Acting Manager Grievance Appeal Section) and Patricia Caruso (Director). Doc. Ent. 1 at 1, 7-12.

## B.    Gardon, Chadwell, Scutt, Lashley and Caruso's Pending Dispositive Motion

On July 30, 2010, five (5) of the seven (7) defendants filed a motion for dismissal and/or summary judgment based on failure to state a claim upon which relief can be granted and failure to exhaust administrative remedies. Doc. Ent. 9. Defendants seek dismissal of plaintiff's complaint in its entirety (Doc. Ent. 9 at 4 ¶ 11), arguing that (I) the Court should dismiss the

---

[7]Judge Steeh has referred this case to me to conduct pretrial matters. Doc. Ent. 6.

[8]Howard appears to be referring to JCF-09-11-02537-017b, which was initiated on September 25, 2009. Doc. Ent. 16-2 at 4-8.

[9]His complaint is signed under penalty of perjury. Doc. Ent. 1 at 6.

[10]*See* Doc. Ent. 8 (June 29, 2010 Appearance of Counsel).

claims against Gardon, Chadwell, Scutt, Lashley and Caruso, because "[p]laintiff did not file and exhaust any grievances against [these defendants][,]" (II) Scutt and Caruso are entitled to dismissal from this case for plaintiff's failure to state a claim, because "[p]laintiff's complaint contains no allegations against . . . Scutt or . . . Caruso[,]" and (III) "Scutt and Caruso are entitled to qualified immunity[.]" Doc. Ent. 9 at 6.

On August 11, 2010, I entered an order setting the deadline for plaintiff's response for September 17, 2010 (Doc. Ent. 11). Plaintiff filed responses on August 19, 2010 (Doc. Ent. 13) and August 24, 2010 (Doc. Ent. 14). He also filed an affidavit on August 27, 2010 (Doc. Ent. 15).

Defendants filed a reply on August 30, 2010 (Doc. Ent. 16) and a supplemental brief on August 31, 2010 (Doc. Ent. 17). On September 10, 2010, plaintiff filed a sur-reply (Doc. Ent. 18).[11] On November 22, 2010, plaintiff filed a response (Doc. Ent. 25).[12]

**C.    Russell and Jones Have Not Timely Responded to Plaintiff's Complaint.**

I note that each of the seven (7) defendants has appeared in this case. On May 28, 2010, the U.S. Marshal received seven (7) copies of documents to effect service of process. Doc. Ent. 7.

---

[11]On September 21, 2010, Assistant Attorney General (AAG) Kevin Himebaugh was substituted for AAG Christine Campbell as counsel for defendants Gardon, Chadwell, Scutt, Lashley and Caruso. Doc. Ent. 20. Counsel filed appearances on behalf of Russell on September 24, 2010 (Doc. Ent. 21) and on behalf of Jones on November 12, 2010 (Doc. Ent. 24).

[12]On the same day, plaintiff also filed a motion for discovery (Doc. Ent. 26), which will be addressed under separate cover. In his November 22, 2010 response to the instant motion, plaintiff claims that the materials sought in his motion to compel discovery "will provide substantial evidence for the Court to deny defendants['] Motion for Dismissal and/or Summary Judgment." Doc. Ent. 25 at 16.

6

The U.S. Marshal attempted service in June 2010.  On June 29, 2010, the Attorney General entered an appearance on behalf of defendants Gardon, Chadwell, Scutt, Lashley and Caruso.  Doc. Ent. 8.  With respect to returned-executed waivers sent in June 2010, answers were due in August 2010.  Therefore, defendants Gardon, Chadwell, Scutt, Lashley and Caruso's July 30, 2010 dispositive motion (Doc. Ent. 9) is timely.[13]

The U.S. Marshal attempted service in September 2010.  On September 24, 2010 and November 12, 2010 the Attorney General entered appearances on behalf of defendants Russell and Jones, respectively.  Doc. Entries 21 and 24.  With respect to returned-executed waivers sent in September 2010, defendants Russell and Jones's answers were due on or about November 22, 2010.  Thus far, the only matters filed on behalf of these two (2) defendants are the September and November 2010 appearances of counsel.  Therefore, defendants Russell and Jones have not timely responded to plaintiff's complaint.

**D.      Fed. R. Civ. P. 12(b)**

Fed. R. Civ. P. 12(b) governs the presentation of defenses.  The instant motion is based upon Subsection (6), which provides that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: . . . (6) failure to state a claim upon which relief can be

---

[13]In the July 30, 2010 motion, the five (5) defendants note that "Defendants Alfred Jones, Richard Russell, and 'Transfer Coordinator' ha[d] not been served."  Doc. Ent. 9 at 9.  However, I note that plaintiff's August 19, 2010 response describes Lashley as the JCF Transfer Coordinator.  Doc. Ent. 13 at 13.  Also, the docket entry for counsel's June 29, 2010 appearance states, "LNU identified as 'Valerie Lashley'[,]" Doc. Ent. 8; and the September 24, 2010 appearance of counsel lists "Valerie Lashley (LNU)[,]" Doc. Ent. 21.

Therefore, this report and recommendation assumes that Valerie Lashley and LNU and the Transfer Coordinator are one in the same.

7

granted[.]"  Fed. R. Civ. P. 12(b)(6).

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d) ("Result of Presenting Matters Outside the Pleadings.").

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true[.]"  *Bell Atlantic Corp.*, 550 U.S. at 555 (citations and quotations omitted).  It is not enough that "the pleadings [leave] open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  *Id*. at 561.  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Id*. at 563.  "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.  Claims should be "nudged . . . across the line from conceivable to plausible" to avoid dismissal.  *Id. See also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950-1951 (2009) ("respondent's complaint has not 'nudged [his] claims' of invidious discrimination 'across the line from conceivable to plausible.'") (quoting *Bell Atlantic Corp.*).

The reviewing court must construe the complaint in the light most favorable to plaintiff and must presume all factual allegations in the complaint as true. *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). The purpose of Rule 12(b)(6) is to give defendant the opportunity to test whether plaintiff is entitled to legal relief as a matter of law even if everything alleged in the complaint is true. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48 (1957), *overruled on other grounds by Bell Atlantic Corp.*, 550 U.S. at 554-563. A dismissal under Rule 12(b)(6) is generally disfavored by courts, as it is a dismissal on the merits. 2A JAMES W. MOORE, MOORE'S FEDERAL PRACTICE ¶ 12.07 (2d ed. 1995).

**E.      Analysis**

**1.      Plaintiff's complaint alleges retaliation, deliberate indifference, due process, fraud and conspiracy.**

The body of plaintiff's April 13, 2010 complaint specifically mentions defendants Gardon; Chadwell and the "transfer coordinator," later identified as Lashley. Also, plaintiff cites Jones's Step I grievance response; plaintiff claims that he did not receive a response to his Step II grievance appeal from the JCF Warden (Scutt); and plaintiff mentions the return of his Step III grievance appeal by Russell. Doc. Ent. 1 at 1-6.

Citing a June 9, 1993 MDOC Correctional Facilities Administration (CFA) Memorandum to Wardens Caruso and LeCureux from Classification Director Dennis Dyke

regarding Prisoner Transfer (Doc. Ent. 13 at 39),[14] plaintiff claims the problem is still occurring

where "a state employee gets angry with a prisoner, and out of spite has the prisoner sent to the

[Upper Peninsula] of Mi[ch]igan, although [it is] not for disciplinary reasons."  Doc. Ent. 1 at 2-

3. According to plaintiff, he "was transferred to the U.P. [in] February [2003], and completed

eighteen [18] months in the U.P. satisfactorily, earning a transfer downstate."  Doc. Ent. 1 at 3.[15]

        Plaintiff's complaint basically alleges that Lashley (the JCF Transfer Coordinator)

fraudulently represented that plaintiff's September 24, 2009 transfer from JCF to KCF was for

security reasons in an attempt to cover up Gardon and Chadwell's "conspiracy to have plaintiff

transferred to KCF, thus committing Fraud, and conspiracy."  According to plaintiff, he had "just

recently had a security screen done for him to be employed at MSI, and he was eight [8] years

misconduct free, nor was he designated as a [Security Threat Group] STG."[16]  He contends that

he "has been consistently getting sick, having flare-ups of his Lupus, where there is no

Rheu[m]atologist in the U.P. of Michigan, and the Doctor at KCF can confirm that plaintiff has

been sick the entire time at KCF."  Doc. Ent. 1 at 4.  Plaintiff claims he "lost employment at MSI

[Michigan State Industries], where he was just [becoming] able to send money home to his sister

_____

[14]Within this memorandum about prisoner transfer, it states, "prisoners who were adjusting
satisfactorily in downstate facilities should not be returned to U.P. facilities to accommodate an
exchange of prisoners or for bedspace needs if they were previously housed in the U.P. with
satisfactory results."  Doc. Ent. 13 at 39.

[15]According to plaintiff, he was "housed in the U.P. from February 2003, to May 2004[.]"
Doc Ent. 25 at 14.

[16]"Prisoners who are active members of a Security Threat Group (STG) shall be identified
and managed in a uniform manner in order to provide for the safety of prisoners and staff and for
facility custody and security."   MDOC PD 04.04.113 ("Security Threat Groups"), effective
11/01/10.

for taking care of his daughter."  Doc. Ent. 1 at 5.[17]

Defendants characterize plaintiff's complaint as alleging that defendants "with willful and deliberate indifference denied [him], who has the auto-immune disorder Lupus, a request to have his family purchase an air mattress for him, denied a request for his family to buy him bottled water, and that [he] was transferred to [KCF] in Michigan's Upper Peninsula in retaliation for the numerous medical treatment requests he made while at the [JCF]."  Doc. Ent. 9 at 9.

**2.      Defendants Gardon, Chadwell, and Lashley are not entitled to summary judgment on the basis that plaintiff has failed to exhaust his administrative remedies in accordance with 42 U.S.C. § 1997e(a).**

Defendants argue that plaintiff did not file a grievance against Gardon for allegedly failing to respond to plaintiff's August 27, 2009 and September 16, 2009 health care kites.  Doc. Ent. 9 at 2 ¶ 5; Doc. Ent. 9 at 9.  Defendants also argue that plaintiff did not file a Step III grievance against Gardon, Lashley  or Chadwell on the basis that plaintiff "was transferred to [KCF] for retaliatory reasons and with deliberate indifference to the Plaintiff's medical conditions, which could be negatively affected by the cold weather in Michigan's Upper Peninsula."  Doc. Ent. 9 at 3 ¶ 6; Doc. Ent. 9 at 10.  Furthermore, defendants argue that plaintiff did not file a grievance through to Step III against Scutt, Lashley or Caruso.  Doc. Ent. 9 at 3 ¶ 8.

In their brief, defendants argue that "[p]laintiff did not file and exhaust any grievances against Defendants Gardon, Chadwell, Scutt, Lashley or Caruso. Therefore, Gardon, Chadwell,

_____

[17]In his November 22, 2010 response, plaintiff notes that he "is currently employed at MSI at KCF."  Doc. Ent. 25 at 4.

11

Scutt, Lashley and Caruso should be dismissed from this action." Doc. Ent. 9 at 11-12. In this

argument, defendants cite MDOC PD 03.02.130, effective July 9, 2007. Doc. Ent. 9 at 11; Doc.

Ent. 9-3 at 5-11. Citing Stapleton's affidavit (Doc. Ent. 9-3 at 2-4), defendants claim that

"Plaintiff did not file and exhaust any grievances through to Step III against any of the named

Defendants regarding any of the allegations contained in the complaint." Therefore, "[t]hey are

entitled to dismissal pursuant to 42 U.S.C. § 1997e(a) for failure to exhaust administrative

remedies." Doc. Ent. 9 at 12.

a.    **JCF–09-11–02537-017b:**  On September 25, 2009, plaintiff completed a Step I grievance

against Gardon and Chadwell, in which he claims he was transferred from Thumb Correctional

Facility (TCF) in Lapeer, Michigan, to JCF for physical therapy and should have been returned

to TCF when physical therapy was completed. The grievance was received at Step I on

November 10, 2009.[18] Doc. Ent. 16-2 at 6, 8. On November 17, 2009, Alfred Jones responded,

"[t]he JCF Transfer Coordinator indicated Mr. Howard was transferred from JCF to KCF for

security reasons." Doc. Ent. 13 at 23 (JCF-09-11-02537-017b). The Step I response was

returned to plaintiff on November 19, 2009, and on December 8, 2009 a Step II grievance appeal

form was sent to plaintiff. Doc. Ent. 16-2 at 2 ¶¶ 4-5, Doc. Ent. 16-2 at 4. According to JCF

Grievance Coordinator Larry McMillan, plaintiff did not return a Step II grievance appeal for

JCF-02537. Doc. Ent. 16-2 at 2 ¶ 6, Doc. Ent. 16-2 at 5.

In his July 29, 2010 affidavit, Richard B. Stapleton (MDOC Office of Legal Affairs)

_____

[18]Although it is dated as having been filled out on September 25, 2009 regarding a September 24, 2009 incident, it is not clear why the Step I grievance was not received at Step I until November 10, 2009. Doc. Ent. 16-2 at 6. I note that what appears to be the second page of the Step I grievance (Doc. Ent. 16-2 at 8) is dated "11/10/09." Perhaps plaintiff began the Step I grievance form on September 25, 2009 but did not finish it until November 10, 2009.

represents that "the plaintiff has filed one grievance through to step III dated 4/24/2009[,]" and "[t]he plaintiff has not filed any grievances through to step III during August and September 2009 while he was housed at [JCF] or [KCF]."  Doc. Ent. 9-3 at 4 ¶ 14.  Attached to this affidavit are Grievance Inquiries which show that JCF-09-04-868-12i was received at Step III on June 24, 2009, was denied and was mailed on July 30, 2009 (Doc. Ent. 9-3 at 12) and which show that a Step III grievance appeal regarding Mound Correctional Facility (NRF) in Detroit, Michigan was received on March 17, 2003 and a Step III grievance appeal regarding KCF was received during 2003 (Doc. Ent. 9-3 at 13).

**b.      Proper exhaustion is defined by MDOC PD 03.02.130.**  "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  1997e(a) ("Applicability of administrative remedies).

"§ 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences."  *Porter v. Nussle*, 534 U.S. 516, 520 (2002).  "As exhaustion of internal remedies is a precondition to filing an action in federal court, the Sixth Circuit has held that a prisoner cannot satisfy Section 1997e by exhausting administrative remedies during the pendency of the federal suit."  *Boles v. Overton*, 396 F.Supp.2d 808, 809 (E.D. Mich. 2005) (Duggan, J.).

The instant motion is based in part upon the United States Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81 (2006).  Doc. Ent. 9 at 7.  In *Woodford*, the Supreme Court considered "whether a prisoner can satisfy the [PLRA's] exhaustion requirement, 42 U.S.C. § 1997e(a), by filing an untimely or otherwise procedurally defective administrative grievance or

appeal." *Woodford*, 548 U.S. at 83-84.  The Supreme Court held that the Prison Litigation

Reform Act (PLRA) "exhaustion requirement requires proper exhaustion."  *Woodford*, 548 at 93

(2006) (holding that "proper exhaustion," that is, exhaustion that complies with "critical

procedural rules" such as time limits for filing grievances, is a precondition to any suit

challenging prison conditions; failure to properly exhaust bars suit in federal court).

Later, the Supreme Court decided *Jones v. Bock*, 549 U.S. 199 (2007).  Succinctly, the

Court found that the PLRA does not: "[1] require a prisoner to allege and demonstrate

exhaustion in his complaint, [2] permit suit only against defendants who were identified by the

prisoner in his grievance, [or] [3] require courts to dismiss the entire action if the prisoner fails to

satisfy the exhaustion requirement as to any single claim in his complaint."  *Jones*, 549 U.S. at

203.

Of particular relevance to this case are the Court's conclusions that "failure to exhaust is

an affirmative defense under the PLRA, and that inmates are not required to specially plead or

demonstrate exhaustion in their complaints[,]" and "[c]ompliance with prison grievance

procedures . . . is all that is required by the PLRA to 'properly exhaust.'  The level of detail

necessary in a grievance to comply with the grievance procedures will vary from system to

system and claim to claim, but *it is the prison's requirements, and not the PLRA, that define the*

*boundaries of proper exhaustion*."  *Jones*, 549 U.S. at 216-218 (emphasis added).

"In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon

which relief can be granted, or seeks monetary relief from a defendant who is immune from such

relief, the court may dismiss the underlying claim without first requiring the exhaustion of

administrative remedies."  42 U.S.C. § 1997e(c)(2).

14

c.      Plaintiff's own complaint admits that, after he arrived again at KCF, he filed a grievance against Gardon and Chadwell for retaliation and deliberate indifference, because "they conspired to have plaintiff transferred to KCF, for a second time."  Doc. Ent. 1 at 3.  Plaintiff cites Jones's November 17, 2009 Step I response, taking issue with the JCF Transfer Coordinator's representations therein.  Doc. Ent. 1 at 3-4 (Doc. Ent. 13 at 23).  He claims JCF Warden Scutt did not respond to his Step II grievance appeal,[19] and plaintiff claims that Russell rejected the Step III grievance appeal.[20]  Based on the absence of a response to his Step II grievance and the rejection of his Step III, plaintiff claims he had "no other recourse but to file this [lawsuit] for resolution."  Doc. Ent. 1 at 5.

To be sure defendants have provided the Court with grievance inquiry printouts for what appear to be Step III grievance appeals.  Doc. Ent. 9-3 at 12-13 (Plaintiff Grievance Inquiry).[21]  However, plaintiff's responses to the dispositive motion challenge defendants' position on exhaustion. First, plaintiff's August 19, 2010 response describes his efforts to appeal to Step II on December 14, 2009 and to Step III on January 14, 2010 (Doc. Ent. 13 at 6-9, 10-12, 13).  Plaintiff takes issue with the conclusion reached in Russell's January 25, 2010 letter, as it is plaintiff's position that he appealed through Step III and has exhausted his administrative grievances.  Doc. Ent. 13 at 9.  Plaintiff contends that defendants' actions "made the grievance procedure totally ineffective."  Doc. Ent. 13 at 13.

---

[19]See Doc. Ent. 13 at 26-29.

[20]See Doc. Ent. 13 at 30-33.

[21]The printout acknowledges that JCF-09-04-868-12i was received at Step III on June 24, 2009, was denied, and was mailed on July 30, 2009.  Doc. Ent. 9-3 at 12.  It also acknowledges two grievances received in 2003, one at NRF and the other at KCF.  Doc. Ent. 9-3 at 13.

15

Also, the attachments to this response include grievance material (Doc. Ent. 13 at 20-21 [Step I uncoded grievance stamped received on January 25, 2010],[22] 23 [Step I Response dated November 17, 2009],[23] 28-29 [Step II appeal dated December 14, 2009], 31-33 [Step III appeal dated January 14, 2009]), 35 [January 25, 2010 letter from Russell regarding the return of plaintiff's grievance]), as well as disbursement authorization forms from KCF dated October 9 / October 13, 2009 (Doc. Ent. 13 at 16)[24] and December 14 / December 16, 2009 (Doc. Ent. 13 at 27).

Second, plaintiff's August 25, 2010 response describes his efforts to appeal to Steps II and III, specifically stating that he did not receive the Step II grievance appeal form he requested and that Scutt did not respond to his self-drafted Step II grievance (Doc. Ent. 14 at 4-5). Third, in his August 24, 2010 affidavit, plaintiff discusses his attempts to appeal the grievance initiated on September 25, 2009 (JCF-09-11-2537-17b). Doc. Ent. 15 at 2-4 ¶¶ 8-14.[25]

---

[22]Plaintiff argues that defendants have not explained why this Step I grievance bears this stamp. Doc. Ent. 13 at 9.

[23]On December 7, 2009 - a date after plaintiff received his Step I response - plaintiff wrote to the KCF records office requesting the reasons for transfer from JCF to KCF. A handwritten note indicates that plaintiff was transferred to KCF "because we needed to transfer a prisoner downstate, and downstate could not just absorb." Doc. Ent. 13 at 25.

[24]In his response, plaintiff claims this disbursement concerned the mailing of his Step I grievance. Doc. Ent. 13 at 6, 7 & 10 ¶ 6.

[25]For example, plaintiff claims that, upon receiving the response to his December 7, 2009 kite to the KCF Records Office, he wrote the KCF grievance coordinator, who informed plaintiff that "he could not provide a [S]tep II grievance, and [plaintiff] had to contact the [JCF Grievance Coordinator] for that [S]tep II grievance appeal form[.]" Doc. Ent. 15 ¶ 9. Plaintiff allegedly waited for the form, and, when he did not receive it, he "drafted and filed a Step II grievance appeal on December 14, 2009[.]" Doc. Ent. 15 ¶ 10. He attests that his Step II grievance appeal was sent to the JCF Warden (Scutt). Doc. Ent. 15 ¶ 11. Furthermore, plaintiff attests that the mailing of his Step III grievance appeal included copies of his Step II grievance appeal, his Step I grievance form and his Step I grievance response. Doc. Ent. 15 ¶ 13.

In defendants' August 30, 2010 reply, they note that plaintiff did not submit a coded copy of his Step I grievance.  Doc. Ent. 16 at 1, Doc. Ent. 13 at 20-21.  In response to plaintiff's claim that he requested but did not receive a Step II grievance appeal form, defendants provide the August 30, 2010 affidavit of Larry McMillan (Doc. Ent. 16-2 at 2-3), to which Step I and Step II grievance database screen printouts for JCF-09-11-02537-17b are attached (Doc. Ent. 16-2 at 4-5).[26]  Defendants also provide a coded Step I grievance and Step I response for JCF-09-11-02537-017b (Doc. Ent. 16-2 at 6-8).  They argue that plaintiff's December 14 /December 16, 2009 disbursement authorization (Doc. Ent. 13 at 27) "is merely a mailing disbursement form for postage that mentions a grievance, but it does not identify that the mailing was in fact for grievance [JCF-02437]."  Also, defendants challenge plaintiff's January 14, 2010 Step III grievance appeal (Doc. Ent. 13 at 31-33) as "a typewritten purported 'copy' of a Step III appeal."  Doc. Ent. 16 at 2.  Defendants note that plaintiff's uncoded Step I grievance form (Doc. Ent. 13 at 20-21) is stamped received on January 25, 2010 by MDOC Grievance & Appeals (where Step III grievances are handled).  Defendants explain that if the January 25, 2010 rejection letter (Doc. Ent. 13 at 35) pertains to the uncoded grievance, "the rejection letter was an appropriate response because there is no indication in Plaintiff's exhibits that Plaintiff submitted the actual coded Step I grievance and Step I response to Step III as an appeal."  Also, defendants explain, "it seems unlikely that if Plaintiff mailed a Step III appeal on January 14, 2010, it would have taken until January 25, 2010 to be received at the MDOC."  Furthermore, defendants explain,

---

[26]Plaintiff completed the grievance form regarding a September 24, 2009 incident on September 25, 2009.  Doc. Ent. 16-2 at 6-8.  According to the screen printouts, it was received on November 10, 2009.  Alfred Jones's Step I response is dated November 17, 2009.  Doc. Ent. 13 at 23.  It was returned to plaintiff on November 19, 2009, and an appeal form was sent on December 8, 2009.  Doc. Ent. 16-2 at 4-5.

17

"[i]t is also unlikely, due to the vast number of grievances handled by the Grievance and Appeals section, that if Plaintiff's [uncoded Step I grievance] was received in that office on January 25, 2010 it would have been dealt with and returned with a rejection letter the same day."  In the end, defendants contend that plaintiff's documentation "does not prove that he indeed filed a Step II appeal or Step III appeal, and the documentation from [the] MDOC - records kept in the ordinary course of business - show that Plaintiff did *not* file a Step II or Step III appeal."  Doc. Ent. 16 at 3 (emphasis in original).

Furthermore, defendants' August 31, 2010 supplemental reply points out differences between the uncoded Step I grievance submitted by plaintiff (Doc. Ent. 13 at 20-21) and the coded grievance submitted by defendants (Doc. Ent. 16-2 at 6, 8), but notes that "[e]ven if the Court were to surmise, somehow, that Plaintiff's Exhibit A is the same grievance as Defendants' Exhibit 1-C, the fact remains that Plaintiff did not pursue the grievance to Step II or Step III, and furthermore, it names only Gardon and Chadwell."  Doc. Ent. 17 at 1-4, 4.

Still, in plaintiff's September 10, 2010 surreply, he represents that he did not receive a Step II grievance appeal form.  Doc. Ent. 18 at 1.  He acknowledges differences between the uncoded Step I grievance submitted by plaintiff (Doc. Ent. 13 at 20-21) and the coded grievance submitted by defendants (Doc. Ent. 16-2 at 6, 8); challenges the authenticity of defendants' copy; explains why he would not have a coded Step I grievance; appears to attribute the differences in incident dates (September 23, 2009 v. September 24, 2009) to the change in his typewriter's print wheel; and explains why his Step II grievance was not coded.  Doc. Ent. 18 at 2-3.

Also, plaintiff refers to the December 14 / December 16, 2009 disbursement

18

authorization form for postage for his Step II appeal (Doc. Ent. 13 at 27); his self-drafted Step III grievance appeal (Doc. Ent. 13 at 31-22), which was rejected by Russell on January 25, 2010 (Doc. Ent. 13 at 35); and the January 25, 2010 stamp on plaintiff's uncoded Step I grievance and(Doc. Ent. 13 at 20-21).  Therefore, plaintiff contends, he gave defendants "a[n] opportunity to resolve this issue of retaliation thereafter resulting in deliberate indifference."  Doc. Ent. 18 at 3.

Then, in his September 10, 2010 motion to compel, plaintiff asserted that the JCF grievance coordinator "has a number of complaints against him concerning failure to process Step I grievances, and a failure to provide prisoners with Step II Appeals forms[.]" Doc. Ent. 19 ¶ 4.  Also, as noted above, plaintiff's September 10, 2010 motion seeks "[a]ny and all complaints against the grievance coordinator [at] JCF for the failure to process Step I grievances, and the failure to provide Step II Appeals forms[;]" and "[a]ny and all complaints against Health Care for the failure to respond to Step I grievances."  Doc. Ent. 19 at 2 ¶¶ 6(d), 6(e).

In his November 4, 2010 affidavit (filed on November 8, 2010), plaintiff states that he did not receive the Step II grievance appeal form he requested.  Doc. Ent. 23 at 5 ¶ 8.  He claims that, on December 14, 2009, he mailed his self-drafted Step II grievance appeal form, along with copies of his Step I grievance, the Step I grievance response, and his December 7, 2009 letter to the KCF Records Office.  Doc. Ent. 23 at 5 ¶ 9.[27]  He also claims that, on January 14, 2010, he self-drafted a Step III grievance appeal form and mailed it that day via an Expedited Legal Mail Disbursement along with a copy of his Step II grievance appeal form, his Step I grievance form,

---

[27]*See also* Doc. Ent. 13 at 11 ¶ 9 [Plaintiff's August 19, 2010 Response]; Doc. Ent. 25 at 6, 15 [Plaintiff's November 22, 2010 Response].

the response to his Step I grievance and the December 7, 2009 letter to KCF's Records Office.
Doc. Ent. 23 at 6 ¶ 11.  According to plaintiff, it was returned on January 19, 2010 on the basis
that a Step III grievance was not considered legal mail, but the items were mailed out on January
20, 2010 after plaintiff attempted mail via a normal Disbursement Authorization Form.  Doc.
Ent. 23 at 6 ¶¶ 12-13.[28]  Also, attached to plaintiff's November 8, 2010 filing is a disbursement
authorization dated January 19, 2010 which indicates that something (purportedly plaintiff's Step
III grievance appeal) was mailed on January 20, 2010 to the MDOC Director.  Doc. Ent. 23 at
11.  Plaintiff claims to have received Russell's January 25, 2010 letter that month.  Doc. Ent. 23
at 6 ¶ 14.

According to plaintiff's November 22, 2010 response, plaintiff's receipt of Russell's
January 25, 2010 letter was accompanied by plaintiff's Step III grievance and attachments,
including the "stamped" and "uncoded" Step I grievance.  Doc. Ent. 25 at 6-7.  He also claims
that he brought this action, because he has not received a response to his Step II and Step III
grievance appeals.  Doc. Ent. 25 at 7.  Specifically, he argues:

> A STATE PRISONER HAS EXHAUSTED HIS ADMINISTRATIVE
> REMEDIES BY ATTEMPTING TO APPEAL HIS DENIAL OF HIS STEP ONE
> GRIEVANCE DECISION AND THUS ENTITLED HIM TO BRING A § 1983
> SUIT, WHERE THE WARDEN AT [JCF] DID NOT ANSWER HIS STEP TWO
> GRIEVANCE, NOR DID THE [MDOC DIRECTOR] ANSWER PLAINTIFF'S
> STEP THREE GRIEVANCE.

Doc. Ent. 25 at 8-16.  Within this argument, plaintiff contends, "over and over again at Step II,
and III defendants did nothing, to resolve this matter."  Citing *Boyd v. Department of*

---

[28]*See also* Doc. Ent. 25 at 6.

*Corrections*, 32 Fed. Appx. 16 (3d Cir. 2002),[29] plaintiff notes that the grievances were received at Step III and contends he has complied with 42 U.S.C. § 1997e(a), notwithstanding any effort to thwart his grievance appeals via the absence of a Step II response by Scutt and the rejection of his Step III grievance appeal by Caruso's office.  Doc. Ent. 25 at 11.

**d.**      It is clear from Jones's November 17, 2009 Step I grievance response that plaintiff completed a Step I grievance on or about September 25, 2009 regarding a September 24, 2009 incident; it specifically mentions Gardon and Chadwell; it was received at Step I on November 10, 2009 and coded as JCF-09-11-02537-017b; and Jones responded to this version of the Step I grievance on November 17, 2009.  Doc. Ent. 16-2 at 6-8.

Furthermore, the Court should conclude that defendants Gardon and Chadwell are not entitled to summary judgment on plaintiff's claims against them on the basis that this Step I grievance has not been exhausted.  Initially, I note that the differences in the "coded" v. "uncoded" versions of the Step I grievance are somewhat of a red herring.  Although the "uncoded" version mentions a denial of access to courts in addition to retaliation and deliberate indifference,[30] the "uncoded" version states that it is filed "against [Gardon] and [Chadwell][,]"

---

[29]"It is crystal clear that, in his attempts to exhaust, Boyd did everything he was required to do and then some and at no time received a response. This is simply impermissible. Before a prisoner is able to come into federal court, he or she is required to follow specific administrative procedures with strict time limits. It is certainly not asking too much of prison authorities that they comply with the requirements similarly imposed upon them. Here, over and over again, appellees did nothing. We take this opportunity to put appellees on notice that conduct so lax if not altogether irresponsible will, if it occurs again, be dealt with in other than a Not Precedential Opinion."  Boyd v. Department of Corrections, 32 Fed. Appx. 16, 18 (3d Cir. 2002).

[30]In plaintiff's habeas case *Howard v. Warren*, Case No. 2:08-cv-10222-PDB-DAS (E.D. Mich.), plaintiff appealed Judge Borman's March 9, 2009 opinion and order granting respondent's motion for summary judgment, denying petitioner's motion for an evidentiary hearing, dismissing the habeas petition, and granting a certificate of appealability. On November 2, 2010, the Sixth

21

and requests "disciplinary actions against [Gardon] and [Chadwell][.]"  Doc. Ent. 13 at 20-21.

More importantly, plaintiff has produced evidence of his December 2009 attempt to appeal to

Step II (Doc. Ent. 13 at 27-29) and his January 2010 attempt to appeal to Step III (Doc. Ent. 13

at 31-33, 35).  Even if Russell's January 25, 2010 letter (Doc. Ent. 13 at 35) construed the

"uncoded" Step I grievance (Doc. Ent. 13 at 20-21) as being filed directly to Step III, plaintiff's

Step II grievance appeal (Doc. Ent. 13 at 27-29) quotes the Step I grievance response, and

plaintiff's Step III grievance appeal (Doc. Ent. 13 at 31-33) mentions that he had not received a

response to his Step II grievance appeal.  Therefore, plaintiff has produced evidence that he

intended the January 2010 mailing as a Step III appeal.  This conclusion is buttressed by

plaintiff's claim that his January 2010 Step III grievance appeal was accompanied by copies of

his Step II grievance appeal, his Step I grievance and his Step I grievance response.  Doc. Ent. 15

¶ 13.

      If the Court agrees that defendants Gardon and Chadwell are not entitled to summary

judgment on the basis that plaintiff's claims against them were not exhausted, then the Court

should consider whether plaintiff's pursuit of JCF-09-11-02537-017b serves to exhaust

plaintiff's claims against Lashley.  It is not until the November 17, 2009 Step I grievance

response that the alleged misrepresentation by Lashley comes into play.  Therefore, the

September 2009 Step I grievance could not have been filed with regard to Lashley.

      However, plaintiff has produced evidence of a December 2009 Step II grievance appeal,

---

Circuit remanded the case to this Court "so that the district court can consider the additional
evidence in determining whether dismissal remains appropriate."  *Howard v. Warren*, Case No. 09-
1360 (6th Cir.).
    The "uncoded" grievance mentions the then pending litigation in Case No. 09-1360 (6th Cir.),
as well as a pending case he has in Wayne County Family Court.  Doc. Ent. 13 at 20-21.

wherein he mentions the JCF Transfer Coordinator's allegedly false statement and seeks "[d]isciplinary action . . . against [Gardon, Chadwell], and now the Transportation Coordinator (JCF) for committing <u>Fraud</u>."  Doc. Ent. 13 at 27-29.  Likewise, plaintiff's Step III grievance appeal states that it was written against Gardon, Chadwell and "upon the transfer coordinator (JCF), for knowingly giving false statements in the [Step I] response."  Therein, plaintiff also reiterates his request for "[d]isciplinary action [to] be taken against [Gardon]; . . . Chadwell, and Transfer Coordinator (JCF)[.]"  Doc. Ent. 13 at 31-33.

As a result, the Court should consider whether the mention of Lashley in the Step II and Step III grievance appeals operates to exhaust plaintiff's claim against her.  In considering this question, I look to the MDOC grievance policy, which generally provides, "[c]omplaints filed by prisoners regarding grievable issues as defined in this policy serve to exhaust a prisoner's administrative remedies only when filed as a grievance through all three steps of the grievance process in compliance with this policy."  MDOC PD 03.02.130 ("Prisoner/Parolee Grievances"), effective July 9, 2007, ¶ B.  Also, grievances may be rejected as duplicative.  *Id*. ¶¶ G(1), Q. Furthermore, I note the following portion of the MDOC Policy Directive's description of the grievance process:

> Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places, and names of all those involved in the issue being grieved are to be included. Information should be confined to the form and not written on the back, sides, or margins of the form, or in the response area.

*Id*. ¶ R.  And, with respect to Step II and Step III grievances, there are provisions for conducting "additional investigation."  *Id*. ¶¶ EE, GG.

Perhaps it would be defendants' position that, upon learning of Lashley's alleged

23

misrepresentation in November 2009, plaintiff should have initiated another grievance. However, the defendants do not address this specific issue of exhaustion as to Lashley in their motion; they simply state, "[p]laintiff did not file any grievances through to Step III against Defendants Debra Scutt, Valerie Lashley or Patricia Caruso[;]" "[p]laintiff did not file and exhaust any grievances against Defendants Gardon, Chadwell, Scutt, Lashley or Caruso[;]" and "there is no record that Plaintiff ever filed and pursued to Step III any grievance against Beth Gardon, Valerie Lashley or Scott Chadwell that alleges that any of them retaliated against Plaintiff[,]" and "Plaintiff did not exhaust his claims against Defendants Gardon, Chadwell, Scutt, Lashley or Caruso."  Doc. Ent. 9 at 3 ¶ 8, 6, 10 ¶ 2, 11, 15.

Furthermore, the Court does not have the benefit of a substantive response as to either plaintiff's Step II or Step III appeals; therefore, the Court could only speculate as to whether the MDOC would have required a new Step I grievance as to plaintiff's claim against Lashley or would have addressed plaintiff's Step II and Step III mention of Lashley in an "additional investigation" and/or rejected a new grievance as to Lashley as duplicative.  Doc. Ent. 9.

Therefore, so long as the Court accepts my foregoing recommendation that defendants Gardon and Chadwell are not entitled to summary judgment on the basis that plaintiff did not pursue his Step I grievance through Step II and Step III, and, in the absence of an argument from defendants that the mention of Lashley in plaintiff's Step II and Step III grievances does not operate to exhaust plaintiff's claims against her, the Court should conclude that defendant Lashley is not entitled to summary judgment on the basis that plaintiff did not exhaust his administrative remedy as to his claim against her.

In sum, the Court should conclude that defendants Gardon, Chadwell and Lashley are not

entitled to summary judgment with respect to plaintiff's claims of retaliation, deliberate

indifference, fraud and/or conspiracy on the basis that plaintiff has failed to exhaust his

administrative remedies in accordance with 42 U.S.C. § 1997e(a).

**3.   At this time, Gardon, Chadwell and Lashley are not entitled to dismissal based upon plaintiff's failure to state claims of retaliation, deliberate indifference, fraud and/or conspiracy against them.**

Plaintiff's claims against Gardon and Chadwell are based upon retaliation and deliberate

indifference, and perhaps conspiracy.  Doc. Ent. 1 at 1, 3, 7.[31]  Plaintiff's claim against the JCF

Transfer Coordinator (Lashley) is based upon fraud and conspiracy.  Doc. Ent. 1 at 4, 10.[32]

A First Amendment retaliation claim is governed by *Thaddeus-X v. Blatter*, 175 F.3d 378

(6th Cir. 1999).  An Eighth Amendment claim of deliberate indifference to a serious medical need

is discussed in *Estelle v. Gamble*, 429 U.S. 97 (1976).  If plaintiff's claim of conspiracy is made

---

[31]In his complaint, plaintiff alleges that he completed his September 2009 Step I grievance against Gardon and Chadwell "for <u>RETALIATION</u>, and <u>DELIBERATE INDIFFERENCE</u>, where [Gardon and Chadwell] conspired to have plaintiff transferred to KCF, for a second time."  Doc. Ent. 1 at 3 (emphasis in original).

[32]Citing the November 17, 2009 Step I response, plaintiff notes that the JCF Transfer Coordinator (Lashley) was interviewed but challenges her representation that plaintiff's physical therapy was completed within six (6) weeks (alleging that it was not completed until March or April of 2009).  Doc. Ent. 1 at 3-4, Doc. Ent. 13 at 23 (JCF-09-11-02537-017b).  Elsewhere, plaintiff claims the March / April / May 2009 conclusion of his physical therapy can be substantiated by examining transportation records, examining Duane L. Waters Hospital (DWH) records and interviewing Transportation Officer Oliver.  Doc. Ent. 13 at 28-29; Doc. Ent. 25 at 9.
Furthermore, plaintiff claims to have followed up on Lashley's representation that plaintiff was transferred from JCF to KCF for security reasons by kiting the KCF records office.  Doc. Ent. 1 at 4; Doc. Ent. 13 at 25 (December 7, 2009 Letter).  At the bottom of plaintiff's December 7, 2009 letter to the KCF records office, there is a handwritten note which states, "Your transfer here [to KCF] was because we needed to transfer a prisoner downstate, and downstate could not just absorb."  Doc. Ent. 13 at 25.  Plaintiff contends there was no reason for Lashley to make a "fraudulent allegation" about the reason for plaintiff's transfer other than "to cover up [Gardon] and [Chadwell's] conspiracy to have plaintiff transferred to KCF, thus committing Fraud, and conspiracy."  Doc. Ent. 1 at 4.

pursuant to 42 U.S.C. § 1985(3) ("Depriving persons of rights or privileges"), it should allege the elements described in *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994). Finally, plaintiff must plead a claim of fraud in accordance with Fed. R. Civ. P. 9(b) ("Fraud or Mistake; Conditions of Mind."), and the elements of a state-law claim of fraud are set forth in *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813 (1976).

Defendants argue that plaintiff "fails to make more than conclusory allegations of retaliation." Doc. Ent. 9 at 3 ¶ 7.[33] It is true that "'conclusory allegations of retaliatory motive unsupported by material facts will not be sufficient to state a ... claim.'" *Hill v. Lappin*, __ F.3d __, No. 09-5575, 2010 WL 5288892, 7 (6th Cir. Dec. 28, 2010) (quoting *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir.2005) (citation and internal quotation marks omitted)). It is also true that, "because of the difficulty in producing direct evidence of an official's retaliatory motive, circumstantial evidence can suffice." *Hill*, 2010 WL 5288892, 7 (citing *Holzemer v. City of Memphis*, 621 F.3d 512, 525-26, (6th Cir.2010)).

However, defendants' argument that plaintiff's allegations are factually deficient is made with respect to defendants Scutt and Caruso. *See* Doc. Ent. 9 at 13. Furthermore, defendants' discussion of deliberate indifference is limited to the statement of facts. *See* Doc. Ent. 9 at 9-10. And, the motion does not mention fraud or conspiracy.

---

[33]Conclusory claims are insufficient to state a cause of action under 42 U.S.C. § 1983. "It is well settled that a pleading fails to state a claim under § 1983 if the allegations are merely conclusory and lack factual specificity." *Davis v. Michigan Dept. of Corrections*, 746 F.Supp. 662, 667 (E.D. Mich. 1990) (Zatkoff, J.) (citing *Place v. Shepherd*, 446 F.2d 1239, 1244 (6th Cir.1971)). *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) ("Although this standard for Rule 12(b)(6) dismissals is quite liberal, more than bare assertions of legal conclusions is ordinarily required to satisfy federal notice pleading requirements.") (citing 5 C. Wright & A. Miller, Federal Practice & Procedure § 1357 at 596 (1969)).

26

On the other hand, plaintiff's August 19, 2010 response addresses the merits of his claims against these defendants.  For example, plaintiff responds that Gardon and/or Chadwell's retaliation against plaintiff resulted in deliberate indifference to plaintiff's serious medical needs, because "there is no Rheumatologist in the U.P. of Michigan to treat [plaintiff's] Lupus."  Doc. Ent. 13 at 3, 8.  Also, plaintiff addresses the objective component (serious medical need) of such an Eighth Amendment claim, noting that defendants transferred plaintiff to Michigan's Upper Peninsula; alleging "[t]here is no [Rheumatologist] in the U.P. of Michigan, or close enough to get to in case that type of physician to effectively treat Lupus[;]" claiming that Gardon and Chadwell transferred him due to his medical needs; contending he has been "subjected to consistent pain ever[] since arriving at KCF[;]" and stating that Lupus is a serious medical need.  Doc. Ent. 31 at 3-4.  Furthermore, plaintiff addresses the subjective component (prison staff's state of mind) of such an Eighth Amendment claim, alleging that Gardon and Chadwell's retaliation caused deliberate indifference.  Doc. Ent. 13 at 4-6.  Also, plaintiff responds that the only possible reason for Lashley's lie was "to protect [Gardon and Chadwell], where prison officials often state that a prisoner is a security problem, and this statement alone will justify the wrongs committed by prison staff."  According to plaintiff, he had been misconduct free for eight (8) years, never had to be placed in administrative segregation and is not designated STG. Therefore, he contends, "there is nothing within his prison record to justify this accusation by . . . Lashley."  Doc. Ent. 13 at 8.  He states he "has a medical history of Lupus, and he was making numerous request[s] for his medical needs[.]" Doc. Ent. 13 at 9-10.  Plaintiff claims that Gardon did not respond to either plaintiff's August 27, 2009 or his September 26, 2009 kites, and he claims that Chadwell "would have had to submit the transfer request."  Doc. Ent. 13 at 10 ¶ 2, 11

¶ 6.  In conclusion, plaintiff claims that Gardon and Chadwell "conspired to have Plaintiff . . . transferred . . . because of the numerous medical needs, and issues[.]" This can be inferred, plaintiff claims, by Lashley's "false statement that Plaintiff was transferred for SECURITY REASONS, [which] gives strong and compelling credibility to Plaintiff's allegations within this [law]suit."  Doc. Ent. 13 at 13.

Then, in his August 25, 2010 amended response, plaintiff argues that Lashley made the false statement to conceal Gardon and Chadwell's retaliation, and "gives strong credibility to Plaintiff's allegations of Retaliation, and Deliberate Indifference," as described in his Step I grievance.  After alleging that there is nothing in his prisoner file to justify Lashley's statement, he states that "he has only had four [4] misconduct reports in over seventeen [17] years of imprisonment, he ha[s] never had to be placed into administrative segregation, nor has he ever been d[e]signated as a STG."  Doc. Ent. 14 at 4.

Furthermore, in his August 24, 2010 affidavit, plaintiff claims he was transferred from JCF to KCF on September 24, 2009 by Gardon and Chadwell, "because of the numerous medical request[s] and demands[.]" Doc. Ent. 15 ¶ 4.  Plaintiff also attests that Lashley's false representation to the Step I grievance respondent - that plaintiff was transferred from JCF to KCF for security reasons - was intended to conceal the retaliation and caused deliberate indifference in the response to his Step I grievance.  Doc. Ent. 15 ¶ 6.  Plaintiff contends "there is nothing within [his] prisoner file[] to justify this statement by the transfer coordinator[.]" Doc. Ent. 15 ¶ 7.[34]

---

[34]In his September 10, 2010 filing, plaintiff contends that his evidence - perhaps the notation on his December 7, 2009 kite to KCF records office (Doc. Ent. 13 at 25) - "add[s] credibility to Plaintiff's allegations of RETALIATION, [resulting in] DELIBERATE INDIFFERENCE."  Doc.

Therefore, because defendants' arguments with respect to defendants Gardon, Chadwell and Lashley are limited to an alleged failure to exhaust, Gardon, Chadwell and Lashley are not entitled to dismissal at this time based upon plaintiff's failure to state claims of retaliation, deliberate indifference, fraud and/or conspiracy against them.

**4.      Defendants Scutt and Caruso are entitled to dismissal based upon plaintiff's failure to state a claim upon which relief may be granted.**

**a.**      Defendant Caruso is the Director of the MDOC, and defendant Scutt is the Warden at JCF.  The body of plaintiff's complaint does not specifically mention defendants Caruso or Scutt; however, the complaint does allege that plaintiff did not receive a response to the Step II grievance appeal from the JCF Warden.  Doc. Ent. 1 at 1-6.  In the list of additional defendants, plaintiff's complaint describes the claims against Scutt as based upon Due Process, Retaliation and Deliberate Indifference.  Doc. Ent. 1 at 5, 8.  The claims against Caruso are described as based upon Due Process, Fraud, Retaliation and Deliberate Indifference.  Doc. Ent. 1 at 12.

Citing *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (U.S. 2009),[35] defendants claim that Caruso "has no liability merely because she is the Director of the MDOC."  Doc. Ent. 9 at 3 ¶ 10.  Also, defendants argue, "[p]laintiff's complaint contains no allegations against Defendants Debra Scutt or Patricia Caruso.  They are entitled to dismissal from this action based on failure to state

---

Ent. 18 at 3.  Also, in his November 22, 2010 response, plaintiff contends that "the attempted cover-up by . . . Lashley that plaintiff was transferred from JCF to KCF for security reasons . . . gives credibility to plaintiff's allegation of Retaliation, and deliberate indifference."  Doc. Ent. 25 at 14.

Furthermore, plaintiff states, "[i]t is well known by [the] prison population [that] if Beth Gardon . . . gets upset with a prisoner, he will be transferred[,]" and plaintiff claims that Chadwell "is the person who submitted the transfer[.]"  Doc. Ent. 25 at 5.

[35]*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (U.S. 2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

a claim." Doc. Ent. 9 at 12-13.

"A pleading that states a claim for relief must contain: . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Bell Atlantic Corp.*, 550 U.S. at 556 n.3.

Specifically, defendants assert that "[t]he Complaint here is devoid of any factual allegations against Defendants Debra Scutt or Patricia Caruso; their names are mentioned only in the Additional Defendant sections of the Complaint." It is defendants' position that "Plaintiff's Complaint fails to state a claim against Debra Scutt or Patricia Caruso, and they are entitled to dismissal with prejudice." Doc. Ent. 9 at 13.

**b.** Liability in a § 1983 action cannot be based on a theory of *respondeat superior*. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978). "[T]he mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 n.58 (1978), citing *Rizzo v. Goode*, 423 U.S. 362, 370-371 (1976).

As the Sixth Circuit has stated:

"Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. *At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.*"

*Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (emphasis added)) (emphasis by *Taylor* court; *see*

*also*, *Monell*, 436 U.S. at 693-95; *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989); *Dunn v. Tennessee*, 697 F.2d 121, 128 (6th Cir. 1982).

> The following three elements are necessary to establish supervisor liability under § 1983:

> (1)...the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2)...the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3)...there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994), citing cases including *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

**c.**     To be sure, plaintiff's responsive briefs elaborate on the bases of his claims against Scutt and Caruso.  For example, plaintiff alleges in his August 19, 2010 response that Scutt violated several rights "where she did not properly train and supervise[] her subordinates [Gardon, Chadwell and Lashley]."  Doc. Ent. 13 at 5.  Plaintiff also claims that Caruso "has not properly trained or supervised her subordinates," and, citing the 1993 Memorandum (Doc. Ent. 13 at 39), plaintiff claims Caruso "is well familiar about prisoners being unjustly sent to [Michigan's Upper Peninsula][.]" Doc. Ent. 13 at 6, 7.  Plaintiff argues that Scutt's failure to respond to the Step II grievance appeal was "condo[n]ing and participat[ing] in the Retaliation and Deliberate Indifference."  Doc. Ent. 13 at 8.  Elsewhere, plaintiff alleges that Scutt "condo[n]ed and participated in this behavior by not responding to Plaintiff's Step II Grievance, thus she did not train, supervise, and discipline her subordinates."  Also, plaintiff states that Caruso "like Warden Scutt, has a responsibility to insure her subordinates are well tr[ai]n[ed], supervised, and if necessary disciplined[.] [T]his did not occur[.]"  Doc. Ent. 13 at 13.

Then, in his August 25, 2010 amended response, plaintiff alleges that Scutt's failure to respond to his Step II grievance "condo[nes] this behavior," therefore, Scutt has participated in the retaliation which caused the deliberate indifference.  Doc. Ent. 14 at 5.  Plaintiff claims his complaint complies with Fed. R. Civ. P. 8(a), where it states, "[p]laintiff after arriving again at KCF, wrote a grievance against [Gardon and Chadwell] for RETALIATION and DELIBERATE INDIFFERENCE, where they conspired to have plaintiff transferred to KCF, for a second time." Doc. Ent. 14 at 6; Doc. Ent. 1 at 3.  Plaintiff explains that Scutt's non-response to the Step II grievance permitted Gardon and Chadwell's conduct "to go unchecked, retaliate against Plaintiff, thus caused the deliberate indifference, where their actions cause[d] the Plaintiff unnecessary pain and suffering, where there is no [Rheumatologist] in the [Upper Peninsula of Michigan] to treat the Plaintiff when needed, and [he] has needed [such treatment] since being transfer[red] to KCF."  Doc. Ent. 14 at 6.  After citing the March 15, 2010 request for RMO review (Doc. Ent. 13 at 37), plaintiff alleges that Scutt, as JCF Warden, "has a responsibility and obligation to train, supervise, and discipline if needed her subordinates [Gardon and Chadwell]." Plaintiff also alleges that Caruso, as Director of the MDOC, "is responsible and obligated to train, supervise, and discipline her subordinates."  Citing the 1993 Memorandum (Doc. Ent. 13 at 39), plaintiff claims Caruso "is well aware that the problem of MDOC employee[s] sending prisoners to [Michigan's Upper Peninsula] facilities for a second time, although the prisoner has previously been housed in [Upper Peninsula] facilities and earn[ed] a transfer down state."  Doc. Ent. 14 at 7.

Additionally, in his September 10, 2010 brief, plaintiff appears to refer to the 1993 memorandum (Doc. Ent. 13 at 39) when claiming that the MDOC Director (Caruso) knows well

32

that MDOC employees "are abusing and going unchecked about sending prisoners back to [the]

U.P. of Michigan[.]" Doc. Ent. 18 at 3-4.  It is plaintiff's position that "although they have been

housed in a U.P. facility previously and earned a transfer back down state because of good

behavior[,] [prisoners] are being returned to a U.P. facility because a[n] MDOC employee get[s]

upset with a prisoner and sends that prisoner back to the U.P. of Michigan although there is no

justification within the prisoner['s] file[] for returning him to the U.P."  Doc. Ent. 18 at 4.

Furthermore, apparently channeling a due process argument,[36] plaintiff contends that "the

grievance procedure is only in place to say a grievance procedure exist[s].  The grievance

procedure is fake and serves no purpose . . . for prisoners to resolve issues."  In other words,

plaintiff appears to be arguing that the grievance process is not meaningful.  Likewise, plaintiff

claims that "[o]nce a grievance is filed and a grievance seems to have substance the grievant is

always transferred, thus the grievant would have to rely upon [the] [U.S.] Mail and all the

respondent has to do is deny receiving it[;] that is the end of the grievance process."  Also,

plaintiff claims, MDOC employees "often use the ph[r]ase SECURITY REASONS or

SECURITY RISK, and that ph[r]ase alone will justify any wrongs committed by the employee."

In the end, plaintiff contends that defendants "are attempting to cloud the real issue of

Retaliation, thus causing Deliberate Indifference, . . . as the defendants have done with Plaintiff's

---

[36]For example, in the context of a due process claim, the United States Supreme Court has stated, "[a]lthough the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."  *Parratt*, 451 U.S. at 544. To the extent plaintiff intended to raise a substantive due process claim, the Sixth Circuit has stated, "[t]he test for substantive due process claims is whether defendants' conduct 'shocks the conscience.'" *Cale v. Johnson*, 861 F.2d 943, 949 (6th Cir. 1988) (citing *Rochin v. California*, 342 U.S. 165 (1952)).

Step II [&] III grievances." Doc. Ent. 18 at 4.

Then, in his November 22, 2010 response, plaintiff specifically addresses supervisory liability. He contends that Scutt, JCF's Warden and Step II grievance coordinator, (1) "failed to adequately train her subordinates [Gardon, Chadwell and Lashley][;]" (2) "should understand that not to train and supervise can cause abuse of authority constituting deliberate indifference[;]" and, (3) her failure to respond to plaintiff's Step II grievance appeal causally relates to Gardon, Chadwell and Lashley's misconduct as Scutt's participation "in the Retaliation, and Deliberate Indifference." Doc. Ent. 25 at 12-13. Plaintiff contends that Caruso is liable for the same reasons; "was well aware of the Retaliation by MDOC [employees]" based upon the 1993 memorandum; and "is well aware of MDOC [employees] sending prisoners back to U.P. facilities" without justification. Doc. Ent. 25 at 13-14. In sum, he claims that Scutt and Caruso's failure to respond to his Step II and Step III grievance appeals equates to their participation in the constitutional violations alleged against other defendants. Doc. Ent. 25 at 15.

However, to the extent plaintiff's claims against Caruso and/or Scutt are based upon their failure to supervise,[37] an allegation that a supervisor was aware of an actionable wrong committed by a subordinate and failed to take corrective action "is insufficient to impose liability on supervisory personnel under § 1983." *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988). As the *Haydon* court stated: "A supervisory official's failure to control, or train the offending individual is not actionable, unless the supervisor 'either encouraged the specific incident or in

---

[37] "[I]t is well established that for municipal or supervisory liability for failure to train or supervise to attach, there first must be an underlying violation of plaintiff's constitutional rights." *London v. Hamilton*, No. CA 3:95CV347-MCK, 1996 WL 942865, *8 (W.D.N.C. Nov. 27, 1996) (citing *Monell* and *City of Canton*).

34

some other way directly participated in it.'" *Haydon*, 853 F.2d at 429 (quoting *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).  *See also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (on appeal from district court judgment granting motion for directed verdict, "Bellamy has made no showing that any of the supervisory officials who were defendants in this case actively participated in or authorized any harassment of appellant.  The testimony presented by Bellamy, at best, indicates that some instances of alleged harassment were brought to the attention of prison supervisory officials.").

Furthermore, "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Shehee*, 199 F.3d at 300 (citing *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998)).  The complaint does not indicate that Caruso and/or Scutt played a part in Lashley's alleged fraudulent representation that plaintiff's September 24, 2009 transfer from JCF to KCF was for security reasons in an attempt to cover up Gardon and Chadwell's "conspiracy to have plaintiff transferred to KCF[.]"  Doc. Ent. 1 at 4.  Nor does the complaint indicate that Caruso and/or Scutt played a part in Gardon and Chadwell's alleged conspiracy to transfer plaintiff.  Plaintiff's complaint does not allege that Caruso and/or Scutt "encouraged the specific incident of misconduct or in some other way directly participated in it[,]" or "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."  *See Taylor*, 69 F.3d at 81.

Therefore, to the extent plaintiff's claims with respect to Caruso and/or Scutt are based upon alleged failures to supervise and/or failures to act, the claims against them do not survive a motion to dismiss.

**5.    The Court need not address whether defendants Scutt and Caruso are entitled to qualified immunity.**

35

Defendants argue that "Defendants Scutt and Caruso are entitled to qualified immunity." Doc. Ent. 9 at 13-15.  Plaintiff responds that defendants "are not entitled to qualified immunity," because, while acting under color of law, they violated his Eighth Amendment right to be free of cruel and unusual punishment.  Doc. Ent. 14 at 7.

As the United States Supreme Court has stated, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-818 (1982).[38]

The Sixth Circuit has stated that the qualified immunity inquiry requires a three-step analysis: "First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir.1996)).[39]  "Once the qualified immunity defense is raised, the burden is on the

---

[38]Furthermore, "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." *Harlow*, 457 U.S. at 818-819.

[39]*See also Saucier v. Katz*, 533 U.S. 194 (2001), wherein the Supreme Court stated, "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier*, 533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the

36

plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir.2004)).

Importantly, the defense of qualified  immunity is best addressed after determining whether plaintiff has stated a constitutional claim upon which relief can be granted.  "[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998), citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

Here, Scutt and Caruso "submit that Plaintiff has failed to plead facts sufficient to describe a clear violation of an established statutory or constitutional right of the Plaintiff." Therefore, "Plaintiff's complaint fails to meet threshold pleading requirements of setting forth a violation of a clearly established constitutional right, and Defendants are entitled to qualified immunity." Doc. Ent. 9 at 15.

As can be seen from these references, defendants' qualified immunity argument contends that plaintiff has not satisfied the first prong; in other words, defendants argue that plaintiff has

---

parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.  *See also Drogosch v. Metcalf*, 557 F.3d 372, 377 (6th Cir. Feb. 25, 2009) (citing *Saucier*, 533 U.S. at 201).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.

Earlier this year, the Supreme Court stated, "[a]lthough we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that *it is often beneficial*."  *Pearson v. Callahan*, 129 S.Ct. 808, 818 (Jan. 21, 2009) (emphasis added).

not shown a constitutional violation.  Doc. Ent. 9 at 13-15.  "Evaluating the defense of qualified

immunity on a motion for summary judgment requires that the court 'adopt [ ] ... the plaintiff's

version of the facts.'"  *Drogosch v. Metcalf*, 557 F.3d 372, 377 (6ᵗʰ Cir. 2009) (quoting *Scott v.

Harris*, 550 U.S. 372 (2007)).  "'If no constitutional right would have been violated were the

allegations established, there is no necessity for further inquiries concerning qualified

immunity.'"  *Id.* (quoting *Saucier*, 533 U.S. at 201).

As noted in the previous section, defendants Caruso and Scutt are entitled to dismissal for

plaintiff's failure to state a claim against them.  Having answered the first prong in the negative,

there is no need to continue the qualified immunity analysis.

**6.     Defendants Jones and Russell are entitled to *sua sponte* dismissal based upon
        plaintiff's failure to state a claim of fraud against them.**

Although Jones and Russell have not timely responded to plaintiff's complaint, they are

entitled to *sua sponte* dismissal based upon plaintiff's failure to state a claim against them.  *See*

28 U.S.C. § 1915A(b)(1); 28 U.S.C. § 1915(e)(2)(B)(ii).

As noted above, plaintiff's complaint refers to defendant Jones's November 17, 2009

Step I grievance response (Doc. Ent. 13 at 23).  After citing the response, plaintiff contends that

Jones "is correct plaintiff was transferred from TCF . . . to JCF for physical therapy[;] however,

physical therapy was not completed until March or April 2009."  Doc. Ent. 1 at 3-4.  In the list of

additional defendants, plaintiff's complaint describes the claim against Jones as based upon

Fraud.  Doc. Ent. 1 at 9.

Also, plaintiff's complaint refers to defendant Russell's January 25, 2010 memorandum

which accompanied the return of plaintiff's grievance (Doc. Ent. 13 at 35).  After citing the

memorandum, plaintiff claims he filed a Step I grievance, he did not receive a response to his

Step II grievance and his Step III grievance was rejected.  Doc. Ent. 1 at 5.  In the list of additional defendants, plaintiff's complaint describes the claim against Russell as based upon Fraud.  Doc. Ent. 1 at 11.

To the extent plaintiff's claims against defendant Jones are based upon his November 17, 2009 denial (Doc. Ent. 13 at 23) of plaintiff's Step I grievance or against defendant Russell are based upon his January 25, 2010 return of plaintiff's Step III grievance,[40] such claims fail to state a claim upon which relief may be granted.  Where defendants' "only roles . . . involve the denial of administrative grievances or the failure to act . . . they cannot be liable under § 1983."  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (on appeal from denial of dispositive motion based upon qualified immunity, "Shehee's only allegations against Crosley, Hambrick, Henry and Miner involve their denial of his administrative grievances and their failure to remedy the alleged retaliatory behavior. With respect to Luttrell, Shehee's only claim is Luttrell's alleged failure to intervene on Shehee's behalf.").

Plaintiff's claims with respect to Jones and Russell are essentially based upon alleged failures to act; therefore, the claims against these defendants would not survive a motion to dismiss.

**7.    Defendants' request for an award of costs is premature.**

Defendants request an award of "costs in their favor."  Doc. Ent. 9 at 15.  This request is premature.  Should the Court enter judgment in favor of defendant, it may present a bill of costs

---

[40]Plaintiff's August 19, 2010 response alleges that Russell committed violations of plaintiff's rights "by not allowing Plaintiff his right to appeal to Step III."  Doc. Ent. 13 at 5-6.  Also, plaintiff's November 22, 2010 response alleges that Russell participated in the constitutional violations by not responding to plaintiff's Step III grievance appeal.  Doc. Ent. 25 at 15.

to the clerk of this Court pursuant to 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d)(1).  If defendant

seeks attorney fees pursuant to 42 U.S.C. § 1988, it should follow the procedure set forth in Fed.

R. Civ. P. 54(d)(2).

## III.   NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific

objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140

(1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United*

*States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but

fail to raise others with specificity, will not preserve all the objections a party might have to this

Report and Recommendation.  *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v.*

*Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than five (5) pages in length

unless by motion and order such page limit is extended by the Court.  The response shall address

specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 2/10/11

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on February 10, 2011.

                              s/Eddrey Butts
                              Case Manager